UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 08-10219-GAO

UNITED STATES OF AMERICA,

v.

BERNARDO CONTRERAS,
Defendant.

FINDINGS AND ORDER
August 18, 2010

O'TOOLE, D.J.

Bernardo Contreras is charged with conspiracy to possess methamphetamine with intent to distribute in violation of 21 U.S.C. § 846 and possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He has moved to suppress evidence that he claims was obtained in violation of his rights under the Fourth and Fifth Amendments. Specifically, he challenges warrantless searches of his vehicle and of his ex-wife's residence, the search of two Express Mail packages pursuant to warrants, and statements elicited during a custodial interrogation that he says occurred without a proper <u>Miranda</u> waiver.

**I.     The Package Searches Pursuant to Warrants**

A.     January 18, 2008 Search Warrant for Parcel #EB807334464US

In late 2007 and early 2008, United States Postal Inspector Michael McCarran, working in Massachusetts, noticed in the course of a review of parcel deliveries what appeared to be a pattern of deliveries of Express Mail parcels between an address in San Diego, California, and two addresses in Boston. According to postal records, between late November 2007 and early January 2008, a sender named Kues mailed five Express Mail packages from San Diego to 19

1

Alpheus Road, Roslindale, three of which were addressed to Luis Contreras and two of which were addressed to Ann Wohlhueter. During the same period, Kues also sent six packages to 78 Chelsea Street, East Boston, five of which were addressed to Bill or William Sullivan. During the same time period, eleven Express Mail packages were sent from the Hyde Park and West Roxbury post offices addressed to Londis Kues or L. Kues at 6372 Lake Leven Drive, San Diego, California. These westward bound packages listed the sender as either the defendant or Ann Wohlhueter and the sender's address as 19 Alpheus Road, Roslindale. The sequence and timing of the various mailings indicated that shortly after a package from Kues was received in Boston, another package was mailed back to him in San Diego. To postal agents, this pattern was consistent with the mailing of controlled substances and the return mailing of proceeds from the sale of controlled substances.

     On January 8, 2008, McCarran intercepted an Express Mail package addressed to Bill Sullivan at 78 Chelsea Street, Boston, Massachusetts. The package listed the sender as L. Kues of 6372 Lake Leven Drive in San Diego, and its seams were heavily taped. McCarran conducted surveillance of the controlled delivery of the package to Sullivan at 78 Chelsea Street. A postal inspector attempted delivery of the package at that address, but when no one answered the door, he left a postal service delivery note indicating the package could be picked up at a local post office. Later that day, an individual identifying himself as William Sullivan arrived at that post office with the delivery notice and picked up and signed for the package.

     Inspector McCarran contacted a fellow postal inspector in San Diego, Ana Flores, to assist in investigating the suspicious pattern of mailings. On January 11, 2008, Flores intercepted an Express Mail parcel addressed to Londis Kues at 6372 Lake Levin Drive with the return sender indicated as Wohlhueter at 19 Alpheus Road. A police narcotic detection canine alerted to

the presence of the odor of controlled substances in the parcel. Flores conducted a controlled delivery of the package, and an individual matching the description of Kues accepted and signed for it using the name Kues.

On January 17, 2008, a package listing the defendant as the sender was mailed to Kues at the San Diego address. Flores intercepted the package. A narcotic detection canine examined the parcel, but did not alert to the presence of the odor of controlled substances. The next day, January 18, 2008, Flores applied for, and a magistrate judge issued, a warrant to search the parcel (Parcel #EB807334464US). Flores executed the warrant the same day. Inside the parcel were two plastic bubble envelopes which contained two bundles wrapped in masking tape and a layer of aluminum foil. Inside each bundle was a vacuum sealed bag containing United States currency. In total, the package contained $56,080.

The defendant argues that the affidavit submitted in support of the search warrant for Parcel #EB807334464US did not adequately establish probable cause to search the package. A warrant application must demonstrate probable cause to believe that a crime has been committed and that specified evidence relevant to the offense will be found at the place to be searched. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). To determine the sufficiency of an application, the Court looks only to the four corners of the application's affidavit to determine if probable cause existed to issue the warrant. United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999).

Here, the affidavit in support of the search warrant sufficiently established probable cause to justify the issuance of the warrant. It recited that, in a relatively short period of time, Kues had sent five Express Mail packages from San Diego to Contreras's and Wohlhueter's residence at 19 Alpheus Road and six Express Mail packages to Sullivan's residence at 78 Chelsea Street.

Likewise, eleven Express Mail packages had been sent by either Contreras or Wohlhueter at 19 Alpheus Drive to Kues in San Diego. By their packaging, timing, and transportation through Express Mail, the packages indicated a pattern consistent with the mailing of controlled substances and the return mailing of proceeds from the sale of controlled substances. The affidavit recited that Wohlhueter, Contreras, and Kues had criminal records involving drug-related arrests and convictions. A narcotic detection dog had positively alerted to a package sent on January 11 from 19 Alpheus Road to Kues, and although the dog did not alert to the parcel at issue in the application, Flores asserted that drug traffickers frequently use extreme packaging and other methods to shield the odor of controlled substances. The totality of information conveyed in the affidavit sufficed to establish probable cause to believe that a crime had been committed and that evidence of that crime would likely be found in the Express Mail package. See United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996).

Moreover, even if the affidavit did not establish probable cause, the good faith exception would preclude suppression. See United States v. Leon, 468 U.S. 897, 922 (1984); United States v. Owens, 167 F.3d 739, 745 (1st Cir. 1999).

B.    January 25, 2008 Search Warrant for Parcel #EB543312097US

On January 22, 2008, Flores learned that Express Mail Parcel #EB543312097US had been mailed from a Roslindale post office to Kues at 6372 Lake Leven Drive. The sender was listed as Wohlhueter at 19 Alpheus Road. Flores intercepted the package. A narcotic detection canine examined the parcel, but did not alert to the presence of the odor of controlled substances. Flores applied for a warrant to search that parcel as well. The second search warrant application included substantially the same information as the first, as well as additional details based on developments in the investigation, including the information that on January 16, 2008, McCarran

had spoken to Massachusetts State Trooper Shawn Murray, who told him that he had received information from a confidential informant that the defendant had developed a source in California for methamphetamine and that he had recently rented an apartment in Roslindale to use to distribute the drugs. No further information was given about the informant. The affidavit also recited the search of Express Mail Parcel #EB807334464US and the resulting discovery of the large amount of currency within the package.

The defendant again challenges the search of the second Express Mail package executed pursuant to a warrant. Assuming *arguendo* the dubious proposition that the defendant has standing to challenge the search of a package of which he was not listed as either a sender or a recipient, see United States v. Koenig, 856 F.2d 843, 846 (7th Cir. 1988), and of which he disclaimed ownership, see United States v. Zapata, 18 F.3d 971, 978 & n.5 (1st Cir. 1994), the application sufficiently established probable cause. The affidavit contained essentially the same information as the previous application, as well as details about the discovery of the $56,080 elaborately wrapped in Parcel #EB807334464US.

The affidavit also included information from a confidential informant whose reliability was not established. However, while the informant's information may have bolstered somewhat the postal inspector's affidavit, the other information in the affidavit alone was sufficient to establish probable cause. The failure to establish the reliability of the informant is of no moment.

And again, as with the first warrant, the good faith exception would preclude the exclusion of the evidence seized. See Leon, 468 U.S. at 922; Owens, 167 F.3d at 745.

## II.     The Warrantless Searches and the Defendant's Interrogation

With respect to warrantless searches conducted of the defendant's truck and the premises at 18 Ruffing Road, Hyde Park, and the defendant's custodial interrogation, I find the following facts based on an assessment of the testimony and exhibits received at the evidentiary hearing held on this motion:

On January 23, 2008, a postal inspector conducted a controlled delivery of an Express Mail package sent from L. Kues and addressed to William Sullivan at 78 Chelsea Street. Police surveillance was established outside Sullivan's address, and later in the day, he was seen leaving 78 Chelsea Street carrying a blue duffel bag. He was driven by another person a short distance to the vicinity of a Dodge Ram pickup. Sullivan got out of the car and approached the defendant, who was standing next to the truck. After the two spoke briefly, Sullivan put the duffel bag into the rear of the pickup, which was covered by a hatch. Sullivan then departed in the same car in which he had arrived.

Massachusetts State Police Trooper Shawn Murray, who was observing the encounter, pulled his unmarked Ford Explorer up behind the pickup truck without activating his lights or siren. No other officers were with him at this point. With his badge displayed, he approached the defendant. Because the defendant's back was turned to him, Murray could not see whether the defendant was holding anything, so as a defensive matter, Murray initially grabbed the defendant's arms to ensure that he was not holding a weapon. He released the defendant's arms once he had ascertained that there was no danger. The defendant said he was waiting for his friend "Bill."

At some point other officers arrived, along with Postal Inspector McCarran. Other than the number of law enforcement officers present, there was no show of force.[1] I find that the defendant was not under arrest and was not in "custody" for <u>Miranda</u> purposes. When questioned, the defendant told the officers that the truck belonged to him, as did anything inside of it, unless someone had put something in it without his knowledge. Murray asked for permission to look in the back of the truck, and the defendant consented. In the cargo area Murray saw the blue duffel bag Sullivan had placed there. The defendant denied ever seeing the bag. Murray opened the bag and found the Express Mail package that had earlier been delivered to Sullivan. The defendant denied knowing Sullivan.

Meanwhile, Sullivan had been followed by other officers and stopped. Murray asked the defendant to remain by the truck, but told him that he was free to leave and was not under arrest. The defendant said that he wanted to be cooperative and would wait by the truck. Three officers stayed with the defendant while Murray and McCarran left to interview Sullivan.

On being questioned by Murray and McCarran, Sullivan admitted that he accepted packages for his friend "Bernie" in exchange for money and drugs. The officers asked for consent to open the package and Sullivan signed a consent form. They opened the package and found what appeared to be, and was later tested and determined to be, methamphetamine.

---

[1] The defendant testified that when the police first approached his truck, he had been physically wrestled to the ground by a trooper other than Murray. He also testified that the trooper had his gun drawn and pointed at him while he was on the ground. I do not credit this testimony. It was, of course, at odds with the testimony given by Trooper Murray. More importantly, it described events that would have been at odds with the police purpose that day, which was to engage the defendant in conversation about the package and Sullivan and to persuade him to cooperate with the investigation. Resorting to physical force at the outset of the encounter would not only have been legally dubious, it would have been practically counterproductive.

The officers returned to the defendant and placed him under arrest. They searched the remainder of the vehicle and discovered additional methamphetamine, a scale, plastic bags, and approximately $1,900 in cash. Murray read the defendant his <u>Miranda</u> rights at the scene.

The officers then transported the defendant to the State Police barracks in Revere, where a booking officer again advised the defendant of his <u>Miranda</u> rights. He was then interviewed by Murray and McCarran. When the interview began, he was read his rights a third time and signed a card acknowledging he understood his rights. It may be noted that the defendant is highly educated, having earned a doctoral degree in biology. He has also had prior encounters with law enforcement. There is no doubt he understood the scope and meaning of his rights regarding interrogation. He told the interrogators that he wanted to cooperate.

The defendant initially denied shipping packages to California. He later admitted that he had sent packages, but insisted that he was sending foot pedals for a drum set to a drummer he met through Craigslist. He later admitted that he had received some packages containing drugs, for which he was paid $500 as a middleman.

During the interrogation, Murray and McCarran asked the defendant for permission to search 19 Alpheus Road and 61 Robert Street. The defendant consented to the search of Alpheus Road and signed a consent form for that purpose, but he refused to consent to the Robert Street property.[2]

Two days later, McCarran and a state police trooper spoke with Georgeann Chavez, Contreras's ex-wife, at her residence, 18 Ruffing Road, Hyde Park. They were waiting outside that address when she returned home with her two children at approximately 4:45 p.m., and they

---

[2] The Alpheus Road apartment was searched that same day. Some packages were found that were empty except for sheets from some San Diego newspapers.

approached her with their badges displayed. She agreed to speak with them and invited them inside. They went to the kitchen and the children went to another room. The officers told Chavez that the defendant had been arrested for trafficking methamphetamine and asked if he had any locked closets at the residence. She said that he had a safe in the front bedroom. Chavez expressed skepticism that the officers were who they purported to be, so McCarran and the other officer showed their credentials and a three-ring binder with investigative materials. Apparently satisfied, Chavez orally consented to a search, including a search of the contents of the safe, as long as she was present. She did not, however, sign a consent form.

In order to open the safe, the officers looked inside a chest and nightstand in search of a key. They found a key which fit the safe, but it did not open it. At that point, Chavez told the officers to get a warrant. They said they would, but they would have to secure the apartment in the meantime while they applied for the warrant. This caused Chavez to change her position, and she then agreed to let them open the safe forcibly. She gave the officers several tools, including a pry bar with which the officers were able to force open the safe. They found $303,080 inside.

A.   Search of the Defendant's Truck

The defendant argues that he did not voluntarily consent to the search of his pickup truck. A search conducted pursuant to valid consent is permissible under the Fourth Amendment even in the absence of a warrant or probable cause. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Whether consent was voluntary is a factual determination requiring consideration of the totality of the circumstances. United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (citing United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989)). Factors to be considered in evaluating voluntariness include an individual's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Id.

Here, at the time of the search, the defendant was middle-aged, held a doctoral degree, and had experience with the criminal justice system based on previous drug-related arrests and convictions. Although a total of five officers eventually arrived at the scene, nothing credible suggests that the defendant's consent was the product of undue coercion. As noted, the defendant's uncorroborated affidavit and testimony averring that he was dropped to the ground by an unidentified state trooper and consented only because that unidentified trooper pointed a gun at his head is not credible. In sum, based on the facts found above, under all the circumstances, I conclude that his consent to the search of the truck was freely given so that the resulting search was lawful.  See id.

B.    The Defendant's Post-Arrest Statements

The defendant argues that his post-arrest statements should be suppressed because they were elicited after he had invoked his right to counsel and without any waiver of his rights. See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). The first argument is new. The defendant did not initially claim to have invoked his right to counsel in his first affidavit, nor did his motion to suppress address the issue. Nevertheless, testifying at the evidentiary hearing held on his motion, the defendant for the first time asserted that he asked for an attorney numerous times, was ignored, and finally began talking two hours into the interview.

This late-raised claim is not credible. First, the defendant's claim that he finally gave in and started answering questions two hours into the interview is inconsistent with the Miranda card and the consent to search forms he signed in the course of the interview. The Miranda card, in evidence as an exhibit, indicates it was signed by the defendant at 2:30 p.m. on January 23.

The consent to search form indicates that it was signed about a half-hour later at 3:01 p.m. This is inconsistent with the two hour time frame to which the defendant testified.[3]

Further, the defendant's claim that he was insisting on the presence of a lawyer before answering questions is inconsistent with the substance of the consent form he signed. In that form, the defendant carefully differentiated between his consent to the search of 19 Alpheus Road and his refusal to consent to the search of 61 Robert Street. He was clearly not just signing whatever forms were put in front of him, but rather was paying attention to the details of the forms. This is not suggestive of a person acting under compulsion.

Moreover, the consent to search form contained, above the defendant's signature, the pre-printed statement, "I have not been threatened, nor forced in any way." Right above that is a handwritten statement added to the form by the defendant about why he would not consent to the search of 61 Robert Street. From the face of the form, it is apparent that he carefully read it, added a notation that he thought was appropriate, omitted to indicate any reservation about the statement that he had not been threatened or forced in any way, and then signed it. These circumstances lead me to conclude not only that his consent was freely given and not coerced, but also that his testimony about demanding an opportunity to consult with counsel was untrue. It is simply unlikely in the extreme that a person succumbing to an interrogation despite repeated requests for counsel only because of persistent police pressure would take care to amend the form to limit the scope of his consent and yet make no protest about the refusal of the police to honor his request for counsel.

---

[3]   It is not possible that the two-hour persistence by the police occurred *before* the defendant signed the Miranda card, because that would have put the beginning of the interrogation at about 12:30 p.m. But that is approximately when the events on the street in East Boston began. By the time those events had occurred and the defendant had been arrested, brought to the Revere State Police barracks, and booked, the time would likely have been very close to the time noted on the card.

The defendant's second argument—that his statements should be suppressed because the government cannot prove the existence of a valid waiver—is likewise unavailing. First of all, the government need not show that a waiver was express. Berghuis v. Thompkins, --- U.S. ---, 130 S. Ct. 2250, 2261 (2010); United States v. Mejia, 600 F.3d 12, 17 (1st Cir. 2010). A waiver "may be implied through the 'defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" Berghuis, 130 S. Ct. at 2254 (quoting North Carolina v. Butler, 441 US 369, 373 (1979)). "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Id. at 2262.

Here, the defendant signed the Miranda card, acknowledging that he understood his rights, and then continued to participate in the interview and gave consent to the search of one property but withheld consent to the search of another. These facts about his conduct, particularly when considered in light of his mature age and high level of education, his prior experience with law enforcement, and the absence of any credible evidence about coercive conduct by the police, lead me to conclude that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights and submitted to the interrogation. See id. at 2261-64; United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993).

C.   Search of 18 Ruffing Street

Finally, the defendant argues for the suppression of all evidence obtained during a warrantless search of 18 Ruffing Street because Chavez did not validly consent to the search. He argues instead that her consent was not voluntary because of coercive behavior of the police officers. While I find that Chavez was surprised when the two officers came to her house unexpectedly and that she was nervous as a result, under the totality of the circumstances, I find

that her consent to the search was voluntarily given, rather than the product of duress or coercion. See United States v. Barnett, 989 F.2d 546, 554-555 (1st Cir. 1993).

Chavez is a middle-aged mother of two who had enough confidence and capacity to question the officers about their legitimacy. The event took place in the middle of the afternoon and involved only two officers, both of whom were cooperative in helping Chavez believe that they were actually law enforcement. Chavez voluntarily told them about the safe and its contents, and she assisted in obtaining the tools necessary to open it. Finally, to the extent that the defendant suggests that a failure to obtain a signed consent-to-search form is fatal to the government's use of the seized evidence, written consent is not essential to establish valid consent. See id. at 555.

### III. Conclusion

For all the foregoing reasons, the defendant's Motion to Suppress Evidence and Statements (dkt. no. 18) is DENIED in all respects.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge